GREENBERG TRAURIG, LLP
Paul J. Schumacher (SBN 114146)
Amy B. Alderfer (SBN 205482)
2450 Colorado Avenue, Suite 400 East
Santa Monica, CA 90404
Telephone: 310-586-7700
Facsimile: 310-586-7800

Attorneys for Petitioner

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

**CV09-7369 SJO (FFMx)**

MORGAN KEEGAN & CO., INC.,

        Petitioner,

vs.

HORACE GRANT,

        Respondent.

CASE NO.

**DECLARATION OF TERRY R. WEISS IN SUPPORT OF MORGAN KEEGAN & CO., INC.'S PETITION TO VACATE ARBITRATION AWARD**

DECLARATION OF TERRY R. WEISS IN SUPPORT OF MORGAN KEEGAN & CO., INC.'S PETITION TO VACATE ARBITRATION AWARD

ATL 17,298,332v1 10-9-09

## DECLARATION OF TERRY R. WEISS

I, Terry R. Weiss, declare as follows:

1.      My name is Terry R. Weiss. I am more than 18 years old, have not been convicted of a felony or crime involving falsity or moral turpitude, and am of sound mind. I have personal knowledge of the following facts and would competently testify thereto under oath if necessary.

2.      I am a shareholder in the law firm Greenberg Traurig, LLP, counsel of record for Petitioner Morgan Keegan & Co., Inc. ("Morgan Keegan") in the above-captioned matter. I was lead counsel for Morgan Keegan in the arbitration before FINRA Dispute Resolution No. 08-00775 styled *Horace Grant v. Morgan Keegan & Co., Inc.*

3.      Attached to this Declaration are true and correct copies of the following documents, which are part of the arbitration hearing record:

           a.      Exhibit A is the Statement of Claim filed by Horace Grant on March 13, 2008.

           b.      Exhibit B is the Answer, not including exhibits, filed by Morgan Keegan & Co. on July 9, 2008.

           c.      Exhibit C is the Award issued by FINRA on September 11, 2009.

1

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct and that this Declaration was executed this 9th day of October, 2009 at Atlanta, Georgia.

Terry R. Weiss

2

# EXHIBIT "A"

*08-755*

# STOLTMANN LAW OFFICES, P.C.

10 South LaSalle Street, Suite 3500, Chicago, IL 60603
Telephone 312-332-4200  Facsimile 312-332-4201
www.InvestmentFraud.Pro

March 13, 2008

**Via U.S. Mail**

Mr. George Friedman
Director of Arbitration
FINRA Dispute Resolution
One Liberty Plaza, 27th Floor
165 Broadway
New York, NY 10006

RE:   **Initial Statement of Claim for Horace Grant (Claimant) vs. Morgan Keegan & Company, Inc. (Respondent)**

Dear Mr. Friedman:

This firm has been retained by Horace Grant ("Mr. Grant" or "Claimant") to recover damages caused by the actions, omissions, breaches of duty, and negligence perpetrated by Morgan Keegan & Company, Inc. ("Respondent" or "Morgan Keegan") and its Agents. Accordingly, we have prepared this Initial Statement of Claim so that you may promptly commence the administration of this matter.

## JURISDICTION

The Financial Industry Regulatory Authority ("FINRA") has jurisdiction over this matter and the instant Statement of Claim is filed pursuant to the FINRA Code of Arbitration Procedure Rule 12200 and pursuant to the arbitration clause contained in the account opening documentation which Morgan Keegan required the Claimants to sign.

## PARTIES

*The Claimant*

Horace Grant, age 42, resided in Arroyo Grande, California at all times relevant. Mr. Grant was born and raised in August, Georgia and graduated from Clemson University after being drafted by the Chicago Bulls with the tenth overall pick in the 1987 National Basketball Association ("NBA") draft. After the draft, Mr. Grant played the power forward position for the Chicago Bulls where he played alongside Michael Jordan and Scottie Pippen en route to three consecutive NBA Championships. Mr. Grant went on to win a fourth NBA Championship with the Los Angeles Lakers in 2001. After four championships, being named to the NBA All Defensive Team four times, being

Exhibit __A__ Page __3__

George Friedman
RE:   Grant v. Morgan Keegan
March 13, 2008
Page 2 of 21

named to the NBA All Star Team in the 1993-1994 season, and fourteen seasons, Mr.
Grant retired from the game in 2004.

The account at issue in this proceeding includes but is not limited to account
number 04147344. The Morgan Keegan investments at issue in this proceeding are:

> a) Regions Morgan Keegan Multi-Sector Income Fund (symbol "RHY"
> hereinafter "Multi-Sector Fund");
> b) Regions Morgan Keegan High Income Fund (symbol "RMH" hereinafter
> "High Income Fund");
> c) Regions Morgan Keegan Strategic Income Fund (symbol "RSF"
> hereinafter "Strategic Income Fund"); and
> d) Regions Morgan Keegan Advantage Income Fund (symbol "RMA"
> hereinafter "Advantage Income Fund");

*Respondent Morgan Keegan*

Respondent Morgan Keegan is incorporated under the laws of the State of
Tennessee and has its principal offices in Memphis, Tennessee. Morgan Keegan was at
all times relevant a securities broker/dealer licensed to do business in the State of
California and is registered with the Securities and Exchange Commission ("SEC"), the
State of California, and FINRA. Morgan Keegan's CRD number is #4161. Morgan
Keegan, therefore, is subject to the laws of the United States and the State of California,
and the rules and regulations promulgated there under by the SEC and the State of
California, and to the rules and regulations of the self-regulating organizations ("SROs")
of which it is a member, in addition to its own internal rules and regulations. Morgan
Keegan is a wholly owned subsidiary of Regions Financial Corporation headquartered in
Alabama.

*Agent James C. Kelsoe*

Agent James Kelsoe (CRD #2166416) is an individual and at all times relevant
worked as a senior portfolio manager of several of Morgan Keegan's mutual funds and
worked out of Morgan Keegan's main headquarters in Memphis. He has been a
registered representative of Morgan Keegan since August 1994. At all times relevant,
Kelsoe was an agent of Morgan Keegan. Agent Kelsoe is not a named Respondent in this
matter.

Exhibit __A__ Page __4__

George Friedman
RE:   **Grant v. Morgan Keegan**
March 13, 2008
Page 3 of 21

*Agent John E. Wilfong*

John E. Wilfong ("Agent Wilfong") is an individual and at all times relevant was a registered representative of Respondent Morgan Keegan.  Agent Wilfong worked at Morgan Keegan's branch office in Memphis, Tennessee, and his CRD number is 1771384.  At all times relevant, Agent Wilfong was one of the registered representatives responsible for servicing Mr. Grant's accounts.  Agent Wilfong was employed by Morgan Keegan from 1988 until December of 2007, when Agent Wilfong left Morgan Keegan and began his employment with UBS Financial Services, Inc.  Agent Wilfong is not a named Respondent in this matter.

*Agent Gregory Sexton*

Gregory Sexton ("Agent Sexton") is an individual and at all times relevant was a registered representative of Respondent Morgan Keegan.  Agent Sexton worked at Morgan Keegan's branch office in Memphis, Tennessee, and his CRD number is 2164023.  At all times relevant, Agent Sexton was one of the registered representatives responsible for servicing Mr. Grant's accounts.  Agent Sexton was employed by Morgan Keegan from 1994 until January of 2008, when Agent Sexton left Morgan Keegan and began his employment with UBS Financial Services, Inc.  Agent Sexton is not a named Respondent in this matter.

*Agent James Darlington II*

James Darlington, II ("Agent Darlington") is an individual and at all times relevant was a registered representative of Respondent Morgan Keegan.  Agent Darlington worked at Morgan Keegan's branch office in Memphis, Tennessee, and his CRD number is 2004439.  At all times relevant, Agent Darlington was one of the registered representatives responsible for servicing Mr. Grant's accounts.  Agent Darlington was employed by Morgan Keegan from 1994 until January of 2008, when Agent Darlington left Morgan Keegan and began his employment with UBS Financial Services, Inc.  Agent Darlington is not a named Respondent in this matter.

*Agent Mark Hahn*

Agent Mark Hahn ("Agent Hahn") is an individual and at all times relevant was a registered representative of Respondent Morgan Keegan.  Agent Hahn worked at Morgan Keegan's branch office in Memphis, Tennessee, and his CRD number is 1394836.  At all times relevant, Agent Hahn was one of the registered representatives responsible for

George Friedman
**RE:   Grant v. Morgan Keegan**
March 13, 2008
Page 4 of 21

servicing Mr. Grant's accounts.  Agent Hahn was employed by Morgan Keegan from 1985 until January of 2008, when Agent Hahn left Morgan Keegan and began his employment with UBS Financial Services, Inc.  Agent Hahn is <u>not</u> a named Respondent in this matter.

## SUMMARY OF WRONGDOING

Morgan Keegan embarked on a reckless plan of selling the Claimant, and others, highly speculative proprietary funds which were not in their best interest.  Morgan Keegan substantially misrepresented and omitted material information regarding the risk to which the Claimant's funds were being exposed.  The word "income" in the Morgan Keegan proprietary funds sold to the Claimant belied the highly speculative nature of the funds and represented a material misrepresentation as to the nature and extent of the risk to which the Claimant was being exposed.

Morgan Keegan and its Agents failed to disclose and misrepresented many material facts regarding their bond funds, including: 1) the nature of the risk being assumed by an investment in these funds; 2) the illiquidity of the securities in which the funds invested in; 3) the extent to which the funds were invested in illiquid securities to the point that they became vulnerable to being unsalable at the prices at which they were being carried on the funds' records; 4) the extent to which the funds were subjected to fair value procedures; 5) the extent to which the values of such securities, and consequently the Net Asset Values ("NAVs") of the funds were based on estimates and the uncertainty inherent in such estimates; 6) the concentration of investments in a single industry; and 7) that the funds had the same overlapping, underlying investments, thereby defeating any potential for diversification between funds.

Morgan Keegan failed to disclose to the Claimant and other investors that these funds had high allocations of collateralized bond obligations ("CBOs"), collateralized loan obligations ("CLOs"), and collateralized mortgage obligations ("CMOs"), collectively called collateralized debt obligations ("CDOs").  The CDOs lost substantial value in the summer of 2007 when the sub prime market collapsed.  This event caused the value of the Morgan Keegan bond funds to plummet, resulting in significant losses for anyone who held interests in these funds, like the Claimant.

The Notes to Financial Statement to the Strategic Income Fund's Statement of Additional Information, discloses the following in Section 3, Concentration of Risk:

Exhibit ___A___  Page ___6___

George Friedman
RE:   **Grant v. Morgan Keegan**
March 13, 2008
Page 5 of 21

The Fund's primary investment objective is to seek a high level of current income. The Fund seeks capital growth as a secondary investment objective when consistent with its primary investment objective.  The Fund will seek to achieve these investment objectives by investing in a diversified portfolio that consists primarily of investment grade and below investment grade debt securities and secondarily of dividend-paying equity securities. The Fund may also invest in other securities which the Advisor believes exhibit the potential for high income or a combination of high income and capital growth.

Additionally, in Appendix B to the Strategic Income Fund's Statement of Additional Information, the following is disclosed:

The diversity of assets that will be available to the Fund provides the potential for a more stable net asset value.

Similarly, in the Notes to the Financial Statement on p. 71 of the Statement of Additional Information for the Multi-Sector High Income Fund, it states:

The Fund's primary investment objective is to seek a high level of current income. The Fund seeks capital growth as a secondary investment objective when consistent with its primary investment objective.  **The fund will seek to achieve these investment objectives by investing in a diversified portfolio** consisting primarily of debt securities that the Advisor believed offer attractive yield and capital appreciation potential.

In the "Fund Facts" section for the Advantage Income Fund, which is available to the public on Morgan Keegan's website, states the following:

RMK Advantage Income Fund consists of a diversified portfolio of primarily high-yield debt securities from multiple asset categories.  Fund features include:

- Attractive monthly income plus capital appreciation potential
- A value investing approach
- Expects to opportunistically employ leverage of up to one-third of its total assets to enhance its total return and yield potential
- Exchange-traded liquidity.

Exhibit __A__ Page __7__

George Friedman
RE:   Grant v. Morgan Keegan
March 13, 2008
Page 6 of 21

Importantly, the information most readily available for a prospective investor to review, states nothing about the speculative nature of this particular "income" fund or that it would be focused primarily in collateralized debt obligations that had serious liquidity issues and traded in very thin markets.

Interestingly enough, the "Investment Risks" section is directly above the "Fund Facts" section on the website. This risk disclosure, again the information most readily available to the public, says nothing about the risk of a near total loss. Instead, it generally describes the functionality of investing in debt securities in a boilerplate and, most importantly, in a verbatim fashion to other Morgan Keegan income funds. Put simply, there is nothing specific about the risks of this fund versus other funds on the firm's website, which is information most readily made available to the Claimants and the investing public.

Unfortunately, the Claimant and other investors were misled into thinking that their investment into these funds was relatively safe. Morgan Keegan's prospectuses and offering materials for these funds were terribly misleading. The Funds did not disclose in their prospectuses that the Funds were exposed to liquidity risk: The risk that the Funds' exotic, new, untested structured securities traded in a thin market and were at risk of suddenly becoming unsalable because the small number of market makers might disappear, leaving the Funds with no one to buy their securities when they wanted to sell them.

The Funds violated the investment restriction against investing more than 25% in the same industry by investing more than 25% of total assets in securities comprised of companies that are engaged in the mortgage loan industry, securities that are derivatives or packages of mortgage loans, and other securities dependent upon or related to the mortgage loan industry.

For example, in September of 2007, 41.6% of the Strategic Income Fund's assets, 64.3% of the High Income Fund's assets, 57.8% of the Multi Sector High Income Fund's assets, and 64.8% of the Advantage Income Fund's assets were allocated in CDO's, CMO's, or Home Equity loans. These Funds all violated the investment restriction against investing more than 25% in the same industry. In addition to impermissible industry concentration, the Funds also suffered from an undisclosed concentration of credit risk in that the Funds' portfolios were heavily invested in structured financial instruments and in a single industry. This risk required financial statement disclosure under generally accepted accounting principles.

Exhibit __A__ Page __B__

George Friedman
RE:   **Grant v. Morgan Keegan**
March 13, 2008
Page 7 of 21

By September of 2007, Mr. Kelsoe essentially admitted his Fund's shortcomings in their semi-annual report. Morgan Keegan's semi-annual report dated September 30, 2007 for the closed-end funds states:

> The turmoil in the mortgage market that began in December 2006 and the credit crunch that began during the fund's first fiscal quarter has continued to plague the performance of both the Fund's net asset value and market valuation. Although below investment grade corporate debt has held up reasonably well, any asset related to residential real estate has been materially devalued. This is especially true for mortgage-backed securities and collateralized debt obligations.

In the same semi-annual report, the Fund manager, Mr. Kelsoe, goes on to state that "given the extreme illiquidity and volatility of credit-sensitive assets, we expect to favor corporate assets and somewhat more straightforward structures until the credit markets begin to gain some sustained stability." At this point, the Strategic Income Fund, the Multi-Sector High Income Fund, the High Income Fund, and the Advantage Income Fund were down 45.97%, 41.82%, 31.70%, and 37.96% for the year respectively.

As a result of this speculative investment strategy employed by Mr. Kelsoe and allowed by Morgan Keegan, the Morgan Keegan Strategic Income Fund, High Income Fund, Advantage Income Fund, and Multi Sector High Income Fund lost 58.1%, 58%, 56.9%, and 60.6% of their value respectively during 2007, mostly in the last six months. For income funds, this is a shocking loss akin to more speculative investments like an OTC fund or nano-technology fund.  **These returns become even more unusual when compared to its peer group, which for 2007 was down only 6.9 percent.** Unfortunately for the Claimant, these funds have continued to lose value in 2008 and are down, on average, an additional 17% year to date.

These losses reflect the fact that the sub-prime meltdown adversely affected the entire peer group.  These numbers also reflect the glaring difference between the performance of the RMK closed-end funds, which were allegedly diversified, at issue and their peer group.  The difference between the funds, put in the simplest terms, was the relative exposure to securities that relied on the strength of the high risk, sub-prime, real estate credit market.

The speculative investment strategy and pattern of misrepresentation engaged in by Mr. Kelsoe was not limited to the closed-end funds held by the Claimant.  Sales

Exhibit ___A___ Page ___9___

Case 2:09-cv-07369-SJO-FFM   Document 2   Filed 10/09/09   Page 12 of 68   Page ID #:21

George Friedman
RE:   **Grant v. Morgan Keegan**
March 13, 2008
Page 8 of 21

materials dated September 30, 2007 for the Select Intermediate Bond Fund, a Morgan Keegan mutual fund, also make several misleading disclosures:

a) The Fund provides:
- A higher level of current income than typical money market investments
- A diversified portfolio of mostly investment-grade debt instruments, with some exposure to below-investment-grade assets.

b) **Concentrate on Value** – Credit fundamentals and relative value drive the investment decisions. The Fund's focus is on "undervalued" and "out-of-favor" sectors and securities, which still have solid credit fundamentals. In addition to purchasing investment-grade securities to fulfill its investment objectives, the Fund may invest up to 35% of its assets in below-investment-grade debt securities. The portfolio seeks to maintain a balanced exposure across the investment-grade spectrum.

c) **Broad Diversification** – The single best way to reduce the risk of any portfolio is through adequate diversification. The Intermediate portfolio is diversified not only with regard to issuer, but also industry, security type and maturity. Furthermore, the Select Intermediate Bond Fund does not invest in speculative derivatives.

No other intermediate term or high-yield bond fund had invested as heavily in these structured financial instruments as did the Morgan Keegan Funds. Indeed, on July 19, 2007, Bloomberg News quoted Jim Kelsoe, the senior portfolio manager of the Funds, as having an "intoxication" with such securities. Bloomberg further reported that an analyst at Morningstar, Inc., the mutual fund research firm, noted that "[a] lot of mutual funds didn't own much of this stuff" and the Morgan Keegan Funds were the exception. Thus, the extraordinary decline (as compared with other funds of their type) in the Funds' net asset value was caused by the illiquidity of the market for the Funds' securities whose values could only be estimated in the absence of readily available market quotations.

The extraordinary declines in the Funds' respective NAVs, and the accompanying losses suffered by investors occurred because:

(a) The Funds' assets were invested in violation of restrictions on the amount of illiquid securities in which the Funds were permitted to invest;

Exhibit ___A___ Page __10__

George Friedman
RE:   **Grant v. Morgan Keegan**
March 13, 2008
Page 9 of 21

(b) The Funds were not properly valuing their portfolio securities to take into account all relevant factors, including but not limited to the nature of the markets for such securities and the uncertainty inherent in the estimated values of such securities;

(c) The valuations of the high-yield and structured securities in which the Fund invested were uncertain and such uncertainty was not disclosed to existing or prospective shareholders;

(d) The Funds were heavily invested in illiquid or thinly traded high-yield and structured securities in concentrations exceeding what comparable funds held;

(e) The Funds' investments exceeded the 25% limit on investments in a single industry;

(f) The Funds' portfolios were exposed to concentrations of credit risk because of their heavy investments in CDOs; and

(g) The structured financial instruments in which the Funds were substantially invested are relatively new instruments whose performance in adverse market conditions had not been tested.

Clearly, the proprietary funds sold to the Claimant were speculative, but the Claimant was never made aware of their highly speculative nature.

The first sentence in the Bloomberg description of each of the closed-end funds reads as follows:

| | Fund | Description |
|---|---|---|
| a) | RMK High Income Fund | RMK High Income Fund, Inc. is a diversified, closed-end management investment company incorporated in the USA. |
| b) | RMK Multi-Sector High Income | RMK Multi-Sector High Income Fund is a diversified, closed-end management invest- |

Exhibit ___A___ Page ___11___

George Friedman
**RE:   Grant v. Morgan Keegan**
March 13, 2008
Page 10 of 21

| | | |
|---|---|---|
| | | ment company incorporated in the USA. |
| c) | RMK Strategic Income Fund | Strategic Income Fund, Inc. is a diversified, closed-end management investment company incorporated in the USA. |
| d) | RMK Advantage Income Fund | RMK Advantage Income Fund is a diversified, closed-end management investment company incorporated in the USA. |

The proprietary funds sold to the Claimant were sold to him as representing diversification or "spreading of risk." They did not, in fact, represent the kind of diversification claimed by Morgan Keegan.  Despite claims of "diversification" the following tables show the substantial overlap in all four of the closed-end funds owned by the Claimant:

| Fund | Top 10 Holdings |
|---|---|
| RMK High Income Fund | Kenmo 2006 – 1A Note<br>AFT 1999 – 1A A1<br>LBAHC 2005 – WLI N4<br>Steer Float 06120118<br>TBRNA 2006 – 6A COM1<br>EDGEN 9 7/8 - 02/01/11<br>CHTR 11 3/4 - 05/15/14<br>KDIAK 2006 – 1A COMB<br>BGFIND 10 1/4 – 01/15/0___<br>DRLRE 2006 – 1A COM |
| RMK Multi-Sector High Income Fund | ACE 2004 – HE3 M11<br>Kenmo 2006 – 1A Note<br>AFT 1999 – 1A A1<br>TBRNA 2006 – 6A COM1<br>PALMS 2A GN<br>EMLT 2004 – 3 B2<br>OFSI 2006 – 1A COM1<br>OMSI 2006 – RSI N2<br>Steer Float 06/20/18 |

Exhibit __A__   Page __12__

George Friedman
**RE:   Grant v. Morgan Keegan**
March 13, 2008
Page 11 of 21

| Fund | Top 10 Holdings |
|---|---|
| | MARM 2006 – OA2XW |
| RMK Strategic Income Fund | Kenmo 2006 – 1A Note<br>CBCI 2002 – AC<br>PPSI 2005 – WCW2 M1O<br>CHTR 11 3/4 – 05/15/14<br>BGFIND 10 1/4 – 01/15/0____<br>LBAHC 2005 – WL1 N4<br>MARM 2006 – OA2XW<br>EDGEN 9 7/8 – 02/01/11<br>Steer Float 06/20/18<br>TBRNA 2006 – 6A COM1 |
| RMK Advantage Income Fund, Inc. | ACE 2004 – HE3 M11<br>Kenmo 2006 – 1A Note<br>AFT 1999 – 1A A1<br>TBRNA 2006 – 6A COM1<br>PALMS 2A CN<br>EMLT 2004 – 3 B2<br>OFSI 2006 – 1A COM1<br>OMSI 2006 – RSI N2<br>Steer Float 06/20/18<br>MARM 2006 – OA2XW |

It is clear that Jim Kelsoe ("Kelsoe"), Portfolio Manager of the Morgan Keegan Funds, would take down all or a substantial portion of numerous new deals as they came to market. He would then distribute various amounts into the Morgan Keegan deals of the kind sold to the Claimant. The overlap of product making up the Morgan Keegan funds was never properly discussed with the Claimant. The over-concentration added risk to what were already extremely leveraged and highly speculative funds. It was false and misleading to sell these over-lapping products to the Claimant under the guise of "diversification".

A Bloomberg comparison (as of November 26, 2007) of the Morgan Keegan funds sold to the Claimant to peer funds illustrates a disastrous pattern of underperformance on the part of the highly speculative, proprietary products sold to the Claimant:

George Friedman
RE:   **Grant v. Morgan Keegan**
March 13, 2008
Page 12 of 21

| Fund | | Performance Total Return % | |
|---|---|---|---|
| | | One Year | Three Year |
| Morgan Keegan Strategic Income (RSF) | | -63.14 | -23.63 |
| | Peers Average | -4.70 | 3.04 |
| Morgan Keegan Multi-Sector High Income (RHY) | | -60.04 | N/A |
| | Peers Average | -4.70 | 3.04 |
| Morgan Keegan High Income Fund (RMH) | | -63.18 | -23.47 |
| | Peers Average | -4.55 | 2.76 |
| Morgan Keegan Advantage Income (RMA) | | -62.17 | -21.78 |
| | Peers Average | -4.55 | 2.76 |

Morgan Keegan <u>cannot</u> claim that the performance of the securities sold to the Claimant is solely a function of "the market." The competitive performance was atrocious and yet <u>no</u> supervisory personnel took any steps to even inform the Claimant what was happening until his losses had mounted substantially.

Kelsoe has conducted several conference calls blaming "the market" and other "factors" for the precipitous decline in the securities held by the Claimant. Kelsoe provided an "RMK Funds Update" on November 7, 2007. In this update, Kelsoe provided mostly self-serving, misleading information rather than offering a true picture of the status of the RMK Funds. Kelsoe stressed market related reasons for the continued abysmal performance of the RMK Funds rather than revealing the poor performance of the RMK Funds relative to their peers.

Kelsoe's "update" cast numerous elements of blame on others:
(a)   ". . . the credit markets have remained under pressure as spreads continue to widen, and economic uncertainty, driven by the deteriorating housing market and high energy prices, weighs on investors minds."

Exhibit A Page 14

George Friedman
RE:   **Grant v. Morgan Keegan**
March 13, 2008
Page 13 of 21

    (b)   ". . . downgrades, can cause a CDO manager or trustee to view the likelihood of cash flows to be lower than previously expected."

    (c)   "In the current market, uncertainty regarding real estate has caused these securities to decline in value."

    (d)   ". . . the secondary market in which these securities trade has become very illiquid."

    (e)   "The worries regarding the real estate market are weighing on the perceived value of the securities we hold."

    There were no revelations of the Morgan Keegan Funds "peer group" comparisons.  Investors, including the Claimant, were led to believe that the problems and any possible solution was a function of the "market".  **The Kelsoe updates reflected an ongoing and continuing pattern of misrepresentations, half-truths, omissions and factual distinctions designed to cover-up Morgan Keegan's flagrant failure to manage or properly supervise Kelsoe.**

    Even as late as January 24, 2008 in a release to shareholders, Kelsoe was still advising investors that outside forces were to blame and took no responsibility for the poor choices he made in creating the funds, selecting investments for the funds, and in administering the funds.

### CLAIMANT'S INVESTMENT IN THE FUNDS

    Based on the aforementioned misrepresentations and omissions made by Morgan Keegan and its Agents, the Claimant made several investments in the Morgan Keegan funds[1].  Morgan Keegan, through its Agents, recommended that the Claimant invest significant portions of his account in Morgan Keegan proprietary mutual funds. Specifically, Agents Wilfong, Sexton, Darlington, and Hahn solicited the Claimant to invest in several Morgan Keegan funds, including:

    a) Regions Morgan Keegan Multi-Sector Income Fund;
    b) Regions Morgan Keegan High Income Fund;
    c) Regions Morgan Keegan Strategic Income Fund; and
    d) Regions Morgan Keegan Advantage Income Fund;

    Horace Grant was a high-net worth client.  As such, he received a high level of service from Morgan Keegan and its Agents.  Mr. Grant opened a Preferred Advisor

---

[1] The investments and losses made in these accounts are approximations.  The Claimants will provide the Respondent and the Panel with a detailed, complete profit and loss analysis at the hearing.

George Friedman
RE:   **Grant v. Morgan Keegan**
March 13, 2008
Page 14 of 21

account with Morgan Keegan for which he was charged a quarterly management fee. Thus, this was an investment advisory relationship and a fiduciary account under current legal standards.  Since Mr. Grant was from Georgia, he was familiar with Regions Bank and the trusted Morgan Keegan name.   Given the substantial funds Mr. Grant accumulated throughout his professional basketball career through both player contracts and endorsements, and since he was now retired from the game, Mr. Grant sought competent, trustworthy professionals to keep his funds secure.

*Horace Grant's Account #04147344*

In Mr. Grant's Preferred Advisor Account #04147344, he invested over $1,079,662.99 in the Advantage Income Fund; $365,276.26 in the High Income Fund; $440,195.40 in the Strategic Income Fund; and $129,177.08 in the Multi Sector High Income Fund over a period starting in MONTH YEAR through January 2008. Mr. Grant has since transferred his accounts to UBS where he still holds these funds. To date, Mr. Grant has incurred unrealized losses of $1,503,423.68.

On July 12, 2007, Mr. Kelsoe met with Agent Wilfong and several of his clients. At this meeting, he told the investors that these funds had no more than 15% of its investments exposed to the sub-prime market. Agent Kelsoe also stated that by the end of the year, there would be an additional dividend disbursement.

## CLAIMS

### Misrepresentations and Omissions

In connection with these inappropriate and unsuitable actions, Morgan Keegan was guilty of numerous misrepresentations and omissions including, but not limited to:

a) Failure to disclose and discuss with the Claimant the true risk of the securities sold to him;
b) Failure to disclose that the Claimant's account would not be properly monitored, and the fund managers would not be properly supervised;
c) Failure to disclose the true speculative nature of the securities sold to him;
d) Failure to disclose that the funds sold to him contained a substantial amount of over-lapping and duplicative collateral;
e) Failure to disclose the extent of leverage involved in the securities sold to him; and

George Friedman
RE:  **Grant v. Morgan Keegan**
March 13, 2008
Page 15 of 21

f) Failure to fully and properly disclose the full extent of fees, commissions and profits being realized by Morgan Keegan in the sale of the proprietary securities sold to the Claimant.

### Violation of the California Corporate Securities Law

The Respondent violated multiple sections of the California Corporate Securities Law of 1968 ("CCSL"), Cal. Corp. Code § 25000 *et seq*.  Under the CCSL, it is unlawful to:

(d) If such person is a broker-dealer or other person selling or offering for sale or purchasing or offering to purchase the security, to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and which he knew or had reasonable ground to believe was so false or misleading.

See Cal. Corp. Code § 25400(d); see also Cal. Corp. Code § 25401(regarding oral misrepresentations in connection with sale of securities) and § 25216 (stating that a violation of the CCSL occurs when a broker-dealer or agent sells a security "by means of any manipulative, deceptive or other fraudulent scheme, device, or contrivance").  One who violates the CCSL is subject to civil liability pursuant to Cal. Corp. Cod § 25500 and § 25501.

Morgan Keegan's scheme involved enticing Mr. Grant to turnover funds to Morgan Keegan without proper knowledge and/or without the intent to monitor those positions as claimed.  Morgan Keegan and its Agents knowingly employed a scheme to obtain Mr. Grant's money by misrepresenting and omitting material facts regarding its expertise and capability or by misrepresenting Morgan Keegan's intention of properly handling these highly-concentrated and highly-volatile positions.  Morgan Keegan knowingly employed the foregoing scheme with the knowledge that Mr. Grant was relying on Morgan Keegan's experience and trusting in Morgan Keegan's good faith actions to make recommendations which were in his best interest.  Mr. Grant reasonably and justifiably relied on the representations and omissions made by the Respondent and its Agents.  As a result, he suffered substantial financial losses.

Exhibit __A__ Page __17__

George Friedman
RE:   **Grant v. Morgan Keegan**
March 13, 2008
Page 16 of 21

## Violation of the California Consumer Legal Remedies Act

The conduct of the Respondent and its Agents also violated the California Consumer Legal Remedies Act. Cal. Civ. Code § 1770. The Respondent and its Agents made the aforementioned misrepresentations and omissions, which constitute a deceptive practice or act under the Consumer Legal Remedies Act. A violation of the Consumer Legal Remedies Act creates civil liability for actual damages, punitive damages, costs, and attorney's fees. See Cal. Civ. Code § 1780.

The Claimant's transactions with the Respondent were made within trade or commerce. The Claimant is a consumer of the Respondent's goods and services. The Respondent and its Agents made these misrepresentations to the Claimant and others with the intent that they rely on these misrepresentations. The Claimant reasonably and justifiably relied on the misrepresentations or omissions made by the Respondent and its Agents. As a direct and proximate result, the Claimant suffered financial harm.

## Breach of Fiduciary Duty

In fee based advisory accounts such as the account at issue, the United States Court of Appeals for the District of Columbia Circuit recently ruled that brokers that charge fees in this capacity are fiduciaries akin to Investment Advisors, overturning the "Merrill Lynch Rule". See *Financial Planning Association v. SEC*, 482 F.3d 481 (D.C. Cir. 2007). The Securities and Exchange Commission declined to appeal the court's ruling to the Supreme Court.

It is clear that brokers are fiduciaries, owing their customers a duty of utmost good faith and loyalty. See *Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 906 F.2d 1206, 1216 (8th Cir. 1990) and *Conway v. Icahn & Co.*, 16 F.3d 504 (2d Cir. 1994). See also *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1049 (11th Cir. 1987) (stating that "The law is clear that a broker owes a fiduciary duty of care and loyalty to a securities investor."); *Ward v. Atlantic Security*, 777 So.2d 1144 (Fla. App. 2001); *Schwartz v. Oberweis*, 826 F.Supp. 280 (N.D. Ind. 1993) (stating that "it is well accepted that a broker is a fiduciary to his client."); *U.S. v. Dial*, 757 F.2d 163, 168 (7th Cir. 1985) (stating that a securities broker stands in a fiduciary relationship with its customer, and such a duty imposes an affirmative duty of utmost good faith, and full and fair disclosure of all material facts); *Marchese v. Shearson Hayden Stone, Inc.*,734 F.2d 414, 418 (9th Cir. 1984); *Securities & Exchange Commission v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963); *Pfaff v. Petrie*, 71 N.E.2d 345, 348 (Ill. 1947) ("A fiduciary relation exists in all cases in which a confidential relationship has been acquired.");

George Friedman
RE:   **Grant v. Morgan Keegan**
March 13, 2008
Page 17 of 21

*Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir. 1992) (imposing fiduciary duty on
securities brokers because a fiduciary relationship arises in situations where "one person
has reposed trust and confidence in another who thereby gains influence and superiority
over the other."); *State ex. rel. PaineWebber v. Voorhees*, 891 S.W.2d 126 (Mo. 1995);
*Glisson v. Freeman*, 532 S.E.2d 442 (Ga. App. 2000); *Beckstrom v. Parnell*, 730 So.2d
942 (La. App. 1998).

Respondent Morgan Keegan and its Agents owed the Claimant and other
customers several fiduciary duties, including, but not limited to: a) the duty to disclose all
material, known risks in the purchase or sale of a security; b) the duty not to misrepresent
any material fact to the transaction; c) the duty to act only in the best interests of the
Claimant; and d) general duties of fair dealing.  Those duties were breached, for the
reasons described above.  The Claimant placed total confidence and trust in Morgan
Keegan and its Agents to handle his portfolio, and there has been a breach of that trust to
the detriment of the Claimant.  As a direct and proximate result of the Respondent's
breach of its fiduciary duties, the Claimant suffered financial damage.

<u>Violation of NASD Conduct Rules</u>

NASD Conduct Rule 2110 provides that, "a member, in the conduct of his
business shall observe high standards of commercial honor and just and equitable
principles of trade."

NASD Conduct Rule 2120, governing the use of manipulative, deceptive or other
fraudulent devices, states that "No member shall effect any transaction in, or induce the
purchase or sale of, any security by means of any manipulative, deceptive or other
fraudulent device or contrivance."

NASD Conduct Rule IM-2310-2, governing the fair dealing with customers,
states:

    (a)(1)  Implicit in all member and registered representative relationships
    with customers and others is the fundamental responsibility for fair
    dealing.  Sales efforts must therefore be undertaken only on a basis
    that can be judged as being within the ethical standards of the
    Association's Rules, with particular emphasis on the requirement to
    deal fairly with the public.

    (2)  This does not mean that legitimate sales efforts in the securities
    business are to be discouraged by requirements which do not take

George Friedman
RE:   Grant v. Morgan Keegan
March 13, 2008
Page 18 of 21

> into account the variety of circumstances which can enter into the member-customer relationship. It does mean, however, that sales efforts must be judged on the basis of whether they can be reasonably said to represent fair treatment for the persons to whom the sales efforts are directed, rather than on the argument that they result in profits to customers.

NASD Conduct Rule 3010(a) specifically mandates the establishment of an effective supervisory system:

> Each member shall establish and maintain a system to supervise the activities of each registered representative and associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with the Rules of this Association. Final responsibility for proper supervision shall rest with the member.

It is not enough to establish the system and then ignore what is happening in an individual account. There were a sufficient number of "red flags" to have elicited *some* response from supervisory personnel. Not once did any Branch Office Manager or Compliance Officer ever question Agent Kelsoe's management of the funds.

NASD Notice to Members 98-96 provides that:

> appropriately designed and implemented supervisory systems and written supervisory procedures serve as a 'frontline' defense to protect investors from fraudulent trading practices and help to ensure that members are complying with rules designed to promote the transparency and integrity of the market . . . [I]t is a violation if the member and/or individual fails to enforce a supervisory system and/or written supervisory procedures.

The Respondent violated each of these NASD Conduct Rules, which directly and proximately resulted in financial harm to the Claimant.

<u>Negligence</u>

In addition to, and apart from, the fiduciary duties set forth above, Morgan Keegan was obliged to maintain and follow the standard of due care reflected in the conduct of prudent persons in the capacities of securities brokers and dealers in relationships similar to those which Morgan Keegan had with the Claimant. It is also true that the standard of

Exhibit A   Page 20

George Friedman
RE:   **Grant v. Morgan Keegan**
March 13, 2008
Page 19 of 21

due care can be established by the Conduct Rules of FINRA.  See *Piper, Jaffrey & Hopwood, Inc. v. Lapin*, 399 F. Supp. 292 (S.D. Iowa, 1975).

The Respondent and its Agents owed the Claimant a duty to use reasonable care in the conduct of their affairs, including the duties to follow all applicable rules and regulations (such as NASD Conduct Rules) and the duties to supervise its Agents.  The Respondent and its Agents breached those duties, as previously described, and those breaches were the actual and proximate cause of the Claimant's damages.

### Failure of Supervision

NASD Conduct Rule 3010 requires that members establish and maintain a system to supervise the activities of each registered representative and associate designed to achieve compliance with applicable securities laws and regulations and with the Rules.

There were numerous "red flags" warranting review or inquiry, most notably, the speculative nature of the highly-leveraged proprietary securities sold to the Claimant should have cried out for investigation and correction.  Proper supervision could have prevented the misrepresentations and omissions made in connection with the sale of the bond funds to the Claimant.  Upon information and belief, Respondent Morgan Keegan had no reasonable supervisory procedures in place and/or failed to follow such procedures to supervise the conduct of Agent Kelsoe and its other Agents.

### Breach of Contract

The agreement, which Morgan Keegan required the Claimant to sign when opening his accounts and which was in full force when the misrepresentations and omissions were made, included a covenant by Morgan Keegan to manage those accounts in accordance with the laws of the United States and the rules and regulations of the SEC, the NASD, and the NYSE.  By virtue of that undertaking, each of the violations of an NASD rule set forth herein is within the jurisdiction of, and cognizable by, this Panel.  The Respondents breached these respective contracts as previously outlined, directly and proximately causing significant financial damage to the Claimant.

### Fraudulent Misrepresentation

Respondent, through its Agents, made material misrepresentations concerning facts and omitted other material facts, in conjunction with the purchase and sale of the securities discussed herein.  Respondent, through its Agents, also misrepresented the

Exhibit __A__ Page __21__

George Friedman
RE:   Grant v. Morgan Keegan
March 13, 2008
Page 20 of 21

level of risk associated with the bond funds.  These misrepresentations and omissions
concealed the level of risk associated with these securities, which were highly
speculative.  The Respondent, through its Agents, knew that the bond funds were highly
speculative investments but specifically, knowingly, and intentionally withheld this
material information from the Claimant.  The Respondent made these representations
with the intent to induce the Claimant to act upon them.  The Claimant reasonably and
justifiably relied upon the Respondent when he invested substantial amounts of money in
these funds.  These actions directly and proximately caused financial damage to the
Claimant.

**Vicarious Liability**

Morgan Keegan is liable for the acts of its employees and Agents, including Agent
Kelsoe, based upon the doctrine of *Respondeat Superior* and the recognition of vicarious
liability by the common law of California.  The conduct of Agent Kelsoe was performed
within the scope and course of his employment as Agent of Morgan Keegan in that, in
connection with the sale of securities, he directly and/or indirectly performed services on
behalf of Morgan Keegan. Respondent Morgan Keegan directly and/or indirectly induced
the acts set forth above.  All of the services were performed in the scope and course of
the employment of Agent Kelsoe; and therefore, the Respondent is jointly and severally
liable with, and to the same extent as, its Agents under the common law and statutory law
of the State of California.

WHEREFORE, the Claimants request that this Panel award them damages from
Respondent Morgan Keegan & Company, Inc. as follows:

A.     Compensatory damages for a sum in excess of $1,503,423.68;
B.     Punitive damages;
C.     Interest on the foregoing amount, together with attorneys fees and the costs
         of this action, pursuant to Cal. Civ. Code § 1780; and
D.     Such other and further relief as this Panel deems just and proper.

George Friedman
**RE:   Grant v. Morgan Keegan**
March 13, 2008
Page 21 of 21

The Claimant requests an arbitration hearing venue of Los Angeles, California.

Respectfully submitted,



One of the Claimants' Attorneys
Andrew Stoltmann
David Neuman
Stoltmann Law Offices, P.C.
10 S. LaSalle Street, Suite 3500
Chicago, IL 60603
T: (312) 332-4200
F: (312) 332-4201

Scot Bernstein
Law Offices of Scott Bernstein
10510 Superfortress Ave., Suite C
Mather Field, CA 95655
T: (916) 447-0100
F: (916) 933-5533

Exhibit __A__ Page 23

# EXHIBIT "B"

BEFORE
FINRA DISPUTE RESOLUTION, INC.

<u>In the Matter of the Arbitration Between:</u>

| | | |
|---|---|---|
| HORACE GRANT, | ) | |
| | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| vs. | ) | FINRA NO. 08-00775 |
| | ) | |
| MORGAN KEEGAN & COMPANY, INC., | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## <u>ANSWER OF RESPONDENT</u>
## <u>MORGAN KEEGAN & COMPANY, INC.</u>

S. Lawrence Polk
Georgia Bar No. 582959
Keith J. Barnett
California Bar No. 210436
SUTHERLAND ASBILL & BRENNAN LLP
999 Peachtree Street, NE
Atlanta, GA 30309-3996
404/853-8225 (telephone)
404/853-8806 (facsimile)

Attorneys for Respondent

Exhibit B   Page 24

# TABLE OF CONTENTS

I. INTRODUCTION ..............................................................................................1

II. FACTUAL BACKGROUND ..........................................................................3

    A.    Claimant's Investment Experience and Financial Wherewithal ...............3

    B.    The RMK Funds. ...................................................................................5

        1.    Claimant Could Not Have Relied on the Sales Materials or Conference Calls He Cites. ...........................................................5

        2.    The RMK Funds Disclosed All of Their Material Risks. ...........6

            a.    The RMK Funds' Prospectuses Disclosed the Nature of the Risk Involved. ...................................................................8

            b.    The RMK Funds' Prospectuses Disclosed Liquidity Risks. ...........10

            c.    The RMK Funds' Prospectuses Disclosed Valuation Procedures. ...............................................................11

            d.    The RMK Funds' Prospectuses Disclosed and Followed Their Concentration Policies. ................................................13

            e.    The Overlap Between the Strategies and Holdings of the Various RMK Funds Was Disclosed and Easily Apparent. ..........14

        3.    The RMK Funds Provided Stellar Performance Until Impacted by the Unprecedented Meltdown of the Credit Markets In 2007. .......................15

    C.    Claimant's Investment History with the RMK Funds Proves His Willingness to Assume Risk. ...................................................................19

III. DEFENSES ..................................................................................................19

IV. CONCLUSION ............................................................................................23

BEFORE
FINRA DISPUTE RESOLUTION, INC.

In the Matter of the Arbitration Between:

HORACE GRANT,                          )
                                       )
                                       )
                                       )
          Claimant,                    )
                                       )
vs.                                    )          FINRA NO. 08-00775
                                       )
MORGAN KEEGAN and COMPANY, INC.,       )
                                       )
          Respondent.                  )
_____    )

## ANSWER OF RESPONDENT
## MORGAN KEEGAN & COMPANY, INC.

Morgan Keegan & Company, Inc. ("Morgan Keegan")[1] answers Horace Grant's

("Claimant") Statement of Claim as follows:

### I. INTRODUCTION

This is a case about Horace Grant, a high net worth individual and former professional

athlete with almost 20 years of investment experience. Claimant took a calculated risk with a

small portion of his substantial net worth on "high income" funds whose offering materials

prominently disclosed the risks involved with the investment strategies. Given Claimant's

extensive investment history, he plainly understood the risks described in the prospectuses.

Indeed, the prospectuses related to the funds at issue disclosed, *on the very first page*, the risks

_____

[1] Morgan Keegan is a regional broker-dealer founded in 1969 offering investment banking,
securities brokerage, and wealth and asset management services. The company is headquartered
in Memphis, Tennessee, and has more than 400 offices in 19 states and more than 4500
employees. The firm secured a seat on the New York Stock Exchange in 1970.

1

Exhibit __B__ Page __26__

associated with high income investment strategies that "concentrated in below investment grade debt securities, ... commonly referred to as 'junk bonds' ... considered speculative with respect to an issuer's capacity to pay interest and repay principal." Claimant's limited investments in the funds at issue[2] were neither imprudent nor outside of his proven risk tolerance. Indeed, Claimant's investment objectives included "Speculation."

In the years following Claimant's initial purchase, the RMK Funds met their "high income" objectives, with many paying higher dividends than virtually any other income fund on the market. While reaping the benefits of these high income strategies, Claimant raised no concerns over the disclosed risks inherent in such spectacular returns, much less lodged the complaints he makes now.

In 2007, broader market forces impacted the RMK Funds' underlying portfolios. As the Panel is undoubtedly aware, Spring 2007 saw the beginning of a meltdown in the credit markets of unprecedented scope and magnitude. What began as a blip in home mortgage defaults early in 2007 led to a debilitating credit crunch in the Summer and then to a market tsunami in the Fall that has engulfed some of the largest Wall Street institutions. Virtually every major bank and brokerage firm has had to write-down *billions* of dollars of value in their credit-related holdings. Indeed, Bear Stearns, one of this country's largest and most venerable investment banking firms has been swept away by the crisis:

---

[2] The funds Claimant places at issue consist of Regions Morgan Keegan High Income Fund ("RMH Fund"), Regions Morgan Keegan Strategic Income Fund ("RSF Fund"), Regions Morgan Keegan Advantage Income Fund ("RMA Fund") and Regions Morgan Keegan Multi-Sector High Income Fund ("RHY Fund") (collectively, the "RMK Funds").

Exhibit __B__ Page __27__



Even some funds that invested exclusively in Triple-A rated debt[3], such as Carlyle Capital, have seen their values completely wiped out, along with the interests of their shareholders.

Claimant is improperly attempting to use Morgan Keegan as a money-back guarantor of his investments. Claimant's losses in the RMK Funds, however, were not caused by any act or omission by Morgan Keegan or any of its employees. Rather, they resulted from the fully disclosed risks inherent in the RMK Funds' "high income" strategies, which Claimant knowingly assumed, coupled with a sudden meltdown of the credit markets. In sum, there is no basis for recovery against Morgan Keegan, and all claims must be dismissed.[4]

## II. FACTUAL BACKGROUND

A.    __Claimant's Investment Background and Financial Wherewithal.__

Claimant is a graduate of Clemson University. After college, he played in the National Basketball Association for 17 years, where he was richly rewarded for his athletic skills. He began investing in the stock market in 1989 through other financial institutions. He had been a Morgan Keegan customer for nine years when he made his investment in the first fund at issue,

---

[3] Triple-A (AAA) is the highest investment grade given by bond rating agencies.

[4] Unless expressly admitted herein, all allegations in the Statement of Claim are hereby denied.

the High Income Fund, in July 2004.  Approximately 90% of Claimant's wealth is invested in foreign and domestic stocks, mutual funds and money market accounts.  Even at the height of Claimant's investments in the RMK Funds, his positions in all of the funds at issue represented only a tiny fraction of his overall net worth, estimated to be over $17 million.  Moreover, Claimant enjoys a guaranteed lifetime income stream, in that he will receive over $58,000 a year from his NBA pension beginning in 2015, together with substantial annual payments from several annuities, and income he currently receives from the basketball camps that he operates.

In 1995, Claimant opened his first two accounts with Morgan Keegan.  One account was an IRA and the other account focused on investing in mutual funds.  While the IRA's investment objective was "Growth," the  investment objectives for the other account were "Tax Advantage," "Growth," "Income," and a final objective of "*Speculation*."  He opened five more accounts with Morgan Keegan in 1997.  One account was an irrevocable trust that invested in mutual funds.  Another account focused on investing in foreign markets with an investment objective of "Growth."  A third account focused on investing in domestic stocks with the same investment objective of "Growth."  Consistent with Claimant's 1997 investment objectives, the other two accounts focused on investing in domestic stocks with "*Speculation*" as their primary investment objectives.

In 1999, Claimant opened two more accounts with Morgan Keegan, one was a trust for one of his children and the other focused on equities.  In Claimant's response to an Investment Profile Questionnaire that he signed in 2000, he stated that he was "seeking moderately high returns, therefore, I will accept the short term fluctuations of higher returning investments."  In this same questionnaire, Claimant stated that he "Strongly Disagree[d]" with the statement that he would have "immediately reallocated[d] [his] portfolio to mainly fixed income securities to

cover [his] losses" if his investment portfolio lost 15 percent of its value over a year due to the stock portion of the portfolio.

Even aside from his substantial future retirement income stream, Claimant desired a very aggressive investment portfolio, together with substantial current income. Claimant maintained a lavish lifestyle with several homes, not to mention child support obligations. Consequently, his Morgan Keegan Financial Advisors, John Wilfong and Doug Meyer, recommended an "aggressive growth" portfolio that included stocks, commodities, and investments in the RMK Funds to meet Claimant's needs.

**B.      The RMK Funds.**

Claimant's allegations are premised on the false assertion that he was misinformed of and did not know the nature and risks of the RMK funds he purchased. (Statement of Claim at 4.) The assertion is not only contradicted by Claimant's extensive investment experience, it runs flat against the irrefutable, written evidence in this case.

**1.      Claimant Could Not Have Relied on the Sales Materials or Conference Calls He Cites.**

As a preliminary matter, the written sales materials and conference call statements that Claimant claims misled him did not—and *could not*—have done so. (Statement of Claim at 12-13.) Missing from the Statement of Claim is any allegation that the Claimant actually read, or even saw, the sales materials or prospectuses about which he now claims to have been misled. Claimant also refers to a July 12, 2007 meeting between Mr. Kelsoe, "Agent Wilfong and several of his clients." (Statement of Claim at 14.) There is no evidence that Claimant was at this meeting nor that he relied upon any of the alleged representations.

Likewise, by the time Jim Kelsoe made the conference calls cited in the Statement of Claim—on November 7, 2007 and November 20, 2007—Claimant had already completed all of

Exhibit ___B___ Page __30__

his purchases of the RMK Funds. In sum, Claimant made no purchase decisions based on the sales materials and conference calls cited in his Statement of Claim. Thus, those allegations are entirely irrelevant.

### 2. The RMK Funds Disclosed All of Their Material Risks.

Claimant makes the false assertion that Morgan Keegan failed to disclose the risks involved in the RMK Funds. (Statement of Claim at 4-6, 13.) Because the risk disclosures in the prospectuses for all of the RMK Funds are simply too numerous to present in this format, Morgan Keegan will generally address each of the risks that Claimant alleges Morgan Keegan failed to disclose by reference to the first prospectus related to his purchase of the RMH Fund (the "Prospectus"), Exhibit 1 hereto. Unless otherwise noted herein, the disclosures contained in the prospectuses related to the other RMK Funds are substantially similar to the RMH Fund, with some variation based on the varied investment strategies of the different funds. The prospectuses disclosed the following similar Investment Objectives:

- *RMH Fund*: "The Fund's primary investment objective is to seek a high level of current income. The Fund seeks capital growth as a secondary objective when consistent with its primary investment objective."

- *RSF Fund*: "The Fund's primary investment objective is to seek a high level of current income. The Fund seeks capital growth as a secondary objective when consistent with its primary investment objective."

- *RMA Fund*: "The Fund's primary investment objective is to seek a high level of current income. The Fund seeks capital growth as a secondary objective when consistent with its primary investment objective."

- *RHY Fund*: "The Fund's primary investment objective is to seek a high level of current income. The Fund seeks capital growth as a secondary objective when consistent with its primary investment objective."

Every risk that Claimant says Morgan Keegan omitted was, in fact, disclosed in the prospectuses that accompanied these RMK Fund offerings. Claimant alleges that Morgan Keegan failed to disclose (a) the nature of the risk involved; (b) liquidity risks; (c) valuation

Exhibit B Page 31

procedures; (d) concentration risks; and (e) that the different RMK Funds had overlapping investments.  (Statement of Claim at 4-6, 7-8, 13.)

Claimant would have needed to read no further than the *top half of the first page* of the Prospectus to discover the fund's objective: "The Fund's primary objective is to seek a high level of current income."  (June 24, 2003 Prospectus, attached hereto as Exhibit 1, at cover page.)  At the top of the same front cover page, the Prospectus laid out the following "Investment Strategy" for achieving the fund's stated objective:

> The Fund will seek to achieve its investment objectives by investing a majority of its total assets in a diversified portfolio of below investment grade debt securities offering attractive yield and capital appreciation potential. ... Because the Fund's investments will be concentrated in below investment grade debt securities, the Fund will be subject to the risks of such securities.  Below investment grade debt securities are commonly referred to as "junk bonds" and are considered speculative with respect to an issuer's capacity to pay interest and repay principal.  They involve greater risk of loss, are subject to greater price volatility and are less liquid, especially during periods of economic uncertainty or change, than higher-rated debt securities.  There can be no assurance that the Fund will achieve its investment objectives.

(Id. (emphasis added.))  In short, the Prospectus disclosed—front and center—the *exact* risks that Claimant now claims were hidden.

To further underscore the risk inherent in this "high income" strategy, a substantial portion of the Prospectus' cover section was devoted to disclosure of the increased risk inherent in its use of leverage.  Not only would the fund concentrate on "junk bonds," but it intended to take on the "special risks" inherent in leveraging those investments.[5]  (Id.)

To drive home the effect of these risks on potential investors, the Prospectus' cover page made absolutely clear, in bold, that the **"high degree of risk"** inherent in its strategy meant investors could lose **"all of their investment"**:

---

[5] The increased risk associated with the Funds' disclosed intention to use leverage are further explained at numerous points throughout the Prospectus, as discussed below.

Exhibit  B  Page  32

> **The Fund's investment strategy of investing the majority of its total assets in below investment grade debt securities and its expected use of leverage involve a high degree of risk. Stockholders could lose some or all of their investment.**

(<u>Id</u>.)

Of course, the Prospectus did not limit its risk disclosures to the cover section. Immediately after the first page's bolded warnings, the Prospectus directed investors to the "Risks" section later in the document. (<u>Id</u>.) Even if Claimant ignored this directive—and ignored the subsequent warning that investors "should review the more detailed information contained in this Prospectus and in the Statement of Additional Information, especially the information set forth under the heading 'Risks' on page 23 of this Prospectus" (<u>id</u>. at 1)—he would have *still* learned about the allegedly undisclosed risks simply by reading the eleven-page "Prospectus Summary," the *majority* of which is devoted to detailing the risks Claimant claims to have been hidden. (<u>Id</u>. at 1 – 11.) The remainder of the Prospectus further disclosed, in detail, the risks about which the Claimant now complains.

      a.    **The RMK Funds' Prospectuses Disclosed the Nature of the Risk Involved.**

As described above, the Prospectus made clear—on the very front page—the <u>nature of the risk</u> involved in the RMK Funds' strategy of investing in below-investment grade bonds and using leverage: investors could suffer an *entire* loss of principal due to the **"high degree of risk"** such a strategy involves. (Exhibit 1 at cover page.) The remainder of the Prospectus further elaborated on the investment strategies that could be employed and the risks they entailed. As explained by the Prospectus, "[a]n investment in the Fund's common shares represents an indirect investment in the securities owned by the Fund. The value of these securities, like other market investments, may move up or down, sometimes rapidly and unpredictably." (<u>Id</u>. at 5, 23.)

Exhibit B  Page 33

The Prospectus elaborated on the types of securities in which the fund may invest, noting that the fund could invest in mortgage-backed securities (id. 7, 15), corporate bonds (id. at 8, 16), "distressed securities" (id.), and "illiquid and restricted securities." (Id. at 10, 18.)

With respect to each type of security, the Prospectus disclosed the particular risks involved. For example, with respect to the mortgage-backed securities, the Prospectus noted the very category of risks that came to fruition during the credit markets meltdown:

> The value of mortgage-backed securities may also change due to shifts in the market's perception of issuers and regulatory or tax changes adversely affecting the mortgage securities markets as a whole. In addition, mortgage-backed securities are subject to the credit risk associated with the performance of the underlying mortgage properties.

(Id. at 7, 26.)

As disclosed in the Prospectus, the risks inherent in each type of portfolio security were exacerbated by the fact that the fund "may invest up to 100% of its assets in debt securities that are rated below investment grade." (Id. at 15.) As the Prospectus explained:

> In the lower quality segments of the debt securities market, changes in perceptions of issuers' creditworthiness tend to occur more frequently and in a more pronounced manner than do changes in higher quality segments of the debt securities market, resulting in greater yield and price volatility.

(Id. at 25.)

These disclosed risks in the underlying portfolio investments were not just increased by the use of "below investment grade securities." These "more pronounced" risks were *further* amplified by the fund's stated intent to leverage the underlying assets by 30%. If Claimant had been unaware of the risks of leverage after over 15 years of investing in mutual funds, stocks and bonds, the Prospectus would have taught him the risks of that technique in no uncertain terms: "Leverage creates an opportunity for an increased return to stockholders, but it is a speculative technique in that it will increase the Fund's exposure to capital risk." (Id. at 6, 24) (emphasis

9

Exhibit ___B___ Page ___34___

added.)  As noted by the Prospectus, "leveraging exaggerates changes in the value and in the yield on the Fund's portfolio.  This, in turn, may result in greater volatility of both the net asset value and the market price of the common shares."  (Id. at 22.)  The Prospectus even laid out detailed hypothetical examples to demonstrate precisely how, in the process of seeking higher returns, leverage can amplify potential losses.  (Id. at 21 – 23.)

In sum, the Prospectus made clear—through statements alternatively panoramic and finely detailed—that the RMK Funds involved a real risk of loss to principal, even "speculative" risk.  Not only did the Prospectus use that exact term throughout (id. at cover page, 2, 6, 7, 16, 24, A-1, A-3, A-4, A-5), but it set forth *precisely how* the fund's high income strategy involved the potential for substantial downside—including loss of "the entire principal that a stockholder invests."  (Id. at 5, 23.)

### b.    The RMK Funds' Prospectuses Disclosed Liquidity Risks.

Claimant's allegation that Morgan Keegan failed to disclose the liquidity risks inherent in the RMK Funds' investments is also patently false.  (Statement of Claim at 4, 8-9.)  Even a brief review of the Prospectus shows that Morgan Keegan warned investors of the liquidity risks in the underlying portfolio.  After stating that the fund may invest up to 100% in below investment grade securities, the Prospectus made clear that "[t]he secondary market for below investment grade securities may not be as liquid as the secondary market for more highly rated securities, a factor that may have an adverse effect on the Fund's ability to dispose of a particular security when necessary to meet is liquidity needs."  (Exhibit 1 at 25.)  The Prospectus went further, noting that market conditions alone could actually render the fund's positions illiquid: "Under adverse market or economic conditions, the secondary market for below investment grade securities could contract further, independent of any specific adverse change in the condition of a particular issuer, and these instruments may become illiquid."  (Id.)

10

Exhibit B  Page 35

Moreover, the Prospectus laid out the potential repercussions of illiquidity: "Illiquid securities may be difficult to dispose of at a fair price at the times when the Fund believes it is desirable to do so.  The market price of illiquid securities generally is more volatile than that of more liquid securities, which may adversely affect the price that the Fund pays for or recovers upon the sale of illiquid securities." (Id. at 10, 28.)  In fact, the Prospectus warned that events might force the fund into the difficult position of having to liquidate its illiquid securities, resulting in a particularly acute risk of losses: "The risks associated with illiquid securities may be particularly acute in situations in which the Fund's operations require cash and could result in the Fund borrowing to meet its short-term needs or incurring losses on the sale of illiquid securities" (Id. at 10, 18.)  In sum, the Prospectus warned investors, including Claimant, that the fund's portfolio assets carried liquidity risks.

     **c.**    **The RMK Funds' Prospectuses Disclosed Valuation Procedures.**

Claimant's vague claim that Morgan Keegan failed to disclose either that the RMK Funds used "fair value procedures" or "the uncertainty inherent in such estimates" likewise fails.  To begin with, all of the RMK Funds at issue here are closed-end funds that traded on the New York Stock Exchange ("NYSE").  Thus, Claimant could buy, sell, and monitor his positions in all of the RMK Funds like any other security on the NYSE.  As with any other stock on the NYSE, the value of the RMK Funds derive directly from the price the market is willing to give.  Thus, the computation of the NAV of the fund's portfolio was of less relevance to Claimant than the price at which the funds were trading on the NYSE.  In fact, as the Prospectus warned, "[s]hares of closed-end funds frequently trade at a discount to their net asset value." (Exhibit 1 at 33.)

Regardless, the RMK Funds fully disclosed the fact that the funds' investment adviser, Morgan Asset Management, would have to value certain portfolio assets using a good faith determination by procedures approved by the respective fund's board of directors.  As described

11

Exhibit **B** Page 36

by the Prospectus, the fund "generally will value its portfolio securities using closing market prices or readily available market quotations." (Id.)  However, as the Prospectus also stated, market prices may not always be available or reliable.  The Prospectus explained that, in such a situation, the security's fair value would be determined according to procedures approved by the fund's board of directors:

> When closing market prices or market quotations are not available or are considered by the Adviser to be unreliable, the Fund may use a security's fair value.  Fair value is the valuation of a security determined on the basis of factors other than market value in accordance with procedures approved by the Fund's Board.

(Id. at 35.)  The Prospectus disclosed the risk that the fair value determined by the Board may be different than the market value:

> The use of fair value pricing by the Fund may cause the net asset value of its shares to differ from the net asset value that could be calculated using closing market prices.

(Id.)  The Prospectus further noted that this was particularly an issue with respect to illiquid securities, which are defined as "investments that cannot be sold or disposed of in the ordinary course of business at approximately the prices at which they are valued":

> In the absence of readily available market quotations a committee appointed by the Fund's Board of Directors ("Board") will price illiquid investments at a fair value as determined in good faith.  Valuing illiquid securities typically requires greater judgment than valuing securities for which there is an active trading market.

(Id. at 18.)

Thus—contrary to the Claimant's allegations—the prospectuses disclosed their use of fair value procedures and the limitations inherent in such valuations.

Exhibit __B__ Page _37_

### d.    The RMK Funds' Prospectuses Disclosed and Followed Their Concentration Policies.

Claimant has lodged an assortment of contradictory and flatly incorrect allegations regarding the extent to which Morgan Keegan allegedly:

(1)    failed to disclose the level of the RMK Funds' "concentration of investments in a single industry" (Statement of Claim at 4);

(2)    failed to disclose *restrictions* on the RMK Funds' concentration of investments "in the same industry" (id. at 6); and

(3)    *violated* the restrictions on the RMK Funds' ability to concentrate in a single industry (Id.)

Each of these allegations is demonstrably false.

First, all of the RMK Funds disclose all of their holdings at least twice a year through semi-annual reports made to shareholders and filed with the United States Securities and Exchange Commission ("SEC"). These reports generally segregate the corporate issuers by industry type, allowing all investors, including the Claimant, to see the industry concentrations of the funds' investments.

Second, as the Claimant's Statement of Claim concedes, the RMK Funds publicly disclosed all of their fundamental investment restrictions *in their entirety*, including the 25% limitation on investment in any one industry:

> The following are the Fund's fundamental investment limitations set forth in their entirety. The Fund may not: ... purchase the securities of any issuer (other than securities issued or guaranteed by the U.S. Government or any of its agencies or instrumentalities) if, as a result, 25% or more of the fund's total assets would be invested in the securities of companies whose principal business activities are in the same industry;

Exhibit __B__ Page __38__

(June 24, 2003 RMH Statement of Additional Information ("SAI"), attached hereto as Exhibit 2, at 2.)[6]

Third, contrary to the Claimant's allegations, the RMK Funds never violated this investment restriction. The Bloomberg information that Claimant points to as a supposed violation of this restriction—on page 9 of their Statement of Claim—is misleading and entirely irrelevant. The referenced Bloomberg data refers to broad categories of *security types*, such as "corporate bonds" and "preferred stock." The 25% investment limitation has nothing to do with security types. The limitation restricts the fund from investing over 25% of the net value of its portfolio into securities—of any type—issued by "companies whose principal business activities are in the same industry." (Id.) To say that a certain level of investments were allocated into "corporate bonds" says nothing as to *which* companies and industries were involved. At the very least, the Claimant's allegations regarding these supposed "concentration" violations are inaccurate and have been lodged recklessly. At worst, the Claimant is guilty of attempting to deliberately mislead this Panel.

     e.    **The Overlap Between the Strategies and Holdings of the Various RMK Funds Was Disclosed and Easily Apparent.**

Finally, Claimant makes the additional disingenuous argument that Morgan Keegan somehow failed to disclose that the various RMK Funds had "overlapping, underlying investments, thereby defeating any potential for diversification between the funds." (Statement of Claim at 4.) This contention is absurd. No fund could assume the duty of disclosing how its particular strategies and holdings overlapped with the thousands of other funds in the market.

---

[6] The prospectuses for the RMK Funds expressly incorporate by reference a SAI through substantially similar language and directed investors to obtain the SAI by any one of at least four free methods, including accessing the document on the SEC's website or calling a toll-free number.

14

Exhibit __B__ Page __39__

What a fund *can* do, however, is disclose who manages the fund, what investment objectives, strategies, and policies it employs, and what portfolio assets it buys and sells. The RMK Funds did precisely that.

Moreover, Claimant could hardly have missed the overlap. Each of the RMK Funds were managed by the same investment adviser (Morgan Asset Management) and each disclosed that the same person, Jim Kelsoe, served as portfolio manager. Each of the RMK Funds had the same primary investment objective of obtaining a "high level" of income. Each of the RMK Funds disclosed a primary investment strategy of investing in debt securities. Each of the RMK Funds disclosed, on at least a semi-annual basis, all of the individual assets held in its portfolio for any investor to cross-check with other securities he may happen to own. In short, the RMK Funds provided all of the tools necessary for Claimant to judge the degree of diversification the RMK Funds provided for the miniscule fraction of their portfolio at issue.

3.   **The RMK Funds Provided Stellar Performance Until Impacted by the Unprecedented Meltdown of the Credit Markets In 2007.**

Each of the RMK Funds, designed primarily to be income-producing, performed admirably for many years. We all recognize, however, that spectacular returns signal a proportionately higher level of risk. Nevertheless, Claimant never complained about assuming these risks while he was obtaining those spectacular returns.

The stellar performance of the RMK Funds prior to 2007 depended, in part, on the orderly, liquid, and stable nature of the credit markets. Many of the RMK Funds' debt securities traded on the "over the counter" ("OTC") market, which meant buys or sales through contact with primary dealers at virtually every major New York brokerage firm, as well as numerous national and regional banks and individual trading firms. As a result of this orderly market, literally trillions of dollars worth of credit and credit-related products freely traded in the capital

markets every year. These include the non-standard lending arrangements known as structured finance. According to the Department of the Treasury, structured finance transactions, including the more complex variations of these transactions, are an essential part of the U.S. and international capital markets.[7] The lack of volatility in many of these products also was based upon the strength of the United States housing market, which, in turn, was fueled by both a relatively low interest rate environment that allowed millions to realize the dream of home ownership and government policy that encouraged the extension of mortgage loans to less credit worthy borrowers.

To facilitate this market, the major credit rating agencies (Moody's, Fitch, and S&P) provided credit ratings on structured finance products and individual portions of those products. These credit ratings gave assurance to the purchasers of such products, such as the RMK Funds, that the products had been reviewed and vetted by an expert independent rating agency. The RMK Funds relied upon these ratings in order to select the products that would be purchased for each individual portfolio, in compliance with the investment guidelines set forth in the prospectuses or other offering materials of the RMK Funds.

Cracks in this orderly market first began to appear in the Spring of 2007. What appeared at first glance to be minor ripples in the market became magnified throughout the remainder of 2007, leading to a meltdown in the credit markets. This, in turn, has led to billions of dollars in write-downs by virtually every major bank and brokerage firm. This market tsunami, which has been compared in magnitude to the stock market crash that proceeded the Great Depression, swamped positions in the RMK Funds' portfolios with such velocity that it was virtually

---

[7] See Policy Statement: Interagency Statement on Sound Practices Concerning Complex Structured Finance Activities, available at http://www.sec.gov/rules/policy/34-49695.htm.

Exhibit __B__ Page __41__

impossible for the RMK Funds to make an orderly exit.  It was this sudden market cataclysm that caused the losses in the RMK Funds, rather than any act or omission by Morgan Keegan.

The RMK Funds first experienced this turbulence in late Spring or early Summer 2007. At that time, certain dealers associated with large Wall Street investment firms began to express a reluctance to bid on structured finance products.  In hindsight, it is now apparent that these Wall Street investment firms stopped making bids because they already had billions of dollars worth of mortgages and associated products on their books that they wanted to sell.  This market imbalance became exacerbated when the credit rating agencies began wholesale downgrades of investment ratings they had given—in some instances just weeks prior—to hundreds of mortgage bonds.  For example, on July 10, 2007, S&P and Moody's announced bond downgrades in the billions of dollars.  The major stock indices were pummeled, as well as the closing prices of Lehman Brothers and Bear Stearns.  A subsequent press report characterized the disclosures as "stunning," and predicted that the downgrades could affect "as much as $2 trillion in various mortgage securities," trigger widespread reevaluation and perhaps wipe out 40 to 50 percent of the value of mortgage securities.[8]  The same article quoted FDIC Chair Sheila Bair as cautioning that future downgrades were likely.  The same day, Fitch announced reviews of 170 subprime bonds.[9]  It has been estimated that, by January 2008, over half of the structured finance securities issued in the United States in 2006 and 2007 had been downgraded by the rating agencies.  These downgrades caused a precipitous drop in the credit markets and adversely affected the values of both investment grade and non investment grade instruments, including the holdings in the RMK Funds.

---

[8] Paul Tharp, *Hedge Horror-Subprime Meltdown Could Wipe Out Billions,* NY Post, 39 (July 12, 2007).

[9] *Fitch May Downgrade Bonds Tied to Subprime Mortgages,* New York Times, 7 (July 13, 2007).

Exhibit __B__ Page __42__

As a result of these downgrades, many holders of structured finance and other credit-related products sought to sell the products in the OTC market which heretofore had been extremely stable. By the summer of 2007, however, the OTC market for structured finance products had seized. This was exacerbated by tightening of credit by banks and broker-dealers. When holders of structured finance products, including the RMK Funds, sought to sell the products, some of which they had purchased literally days before, major dealers refused to buy (or even bid) on the products, thus triggering the staggering liquidity crisis that continues to date.

This liquidity crisis, and the resulting lack of a market, called into question the valuations of credit-related products under applicable accounting rules. These accounting rules require the holder of credit-related products to mark down those products' value due to the lack of liquidity even though many continue to generate ample cash flows. The RMK Funds were ahead of much of the market in terms of reducing the values of the structured finance and other credit-related products in the RMK Funds' portfolios in response to the weakening markets. While these reductions in value caused a drop in NAV, it was the prudent course of conduct for the RMK Funds. In contrast, many holders of credit-related products waited until the end of 2007 before finally reducing the values of their holdings or writing off the values of these products on their balance sheets. These companies subsequently foisted upon the investing public billions of dollars of write-downs, or in the case of Bear Stearns or the Carlyle Funds, vaporized almost overnight.[10]

At the time of this writing, the RMK Funds, and virtually all of America, are at the mercy of a dysfunctional capital market where performing instruments (such as those held by the RMK Funds), must be marked down to pennies on the dollar in order to comply with accounting rules.

---

[10] Despite the recent havoc in the credit markets, the RMK Funds continue to generate income.

Exhibit __B__ Page __43__

Indeed, the Federal Reserve now finds itself in a similar position, having acquired nearly $30 billion of securities formerly held by Bear Stearns. Nevertheless, as Federal Reserve Chairman Ben Bernanke has recently stated, there is reason to believe, if investors "avoid the need to sell into a distressed market, that we will recover the full amount, and that, in addition, if we are fortunate, we may turn a profit beyond that."

**C.     Claimant's Investment History Proves His Willingness to Assume Risk.**

Claimant's investment background and history demonstrates his knowing assumption of the risks inherent in the RMK Funds' disclosed investment strategies. As noted above, Claimant's purported losses as set forth in his Statement of Claim do not list the funds' dividends or dividend reinvestments.

## III. DEFENSES

As demonstrated by the facts above, and as will be demonstrated at the evidentiary hearing for this matter, Claimant's claims fail for the following reasons[11]:

### 1.

The Statement of Claim fails to state a cause of action upon which relief may be granted.

### 2.

All activity in the accounts was suitable for and consistent with Claimant's stated investment objectives and financial situation.

### 3.

Claimant authorized, directed and ratified all of the transactions in his account.

### 4.

To the extent any material risks were not disclosed, they were unforeseeable. "The securities laws do not insulate investors against stock downturns which are caused by

---

[11] Morgan Keegan reserves the right to bring additional facts and legal authority to the Panel.

Exhibit B Page 44

events not foreseeable to the company's management, nor do they provide insurance against risks that were disclosed to investors at the time they purchased securities." Miller v. Pezzani (In re Worlds of Wonder Sec. Litig.), 35 F.3d 1407, 1420 (9th Cir. 1994).

**5.**

Claimant's breach of contract claim fails for the simple reason that Claimant has not identified any contractual provision Morgan Keegan can be said to have violated.

**6.**

Claimant's negligence claim fails because Morgan Keegan breached no duties owed to Claimant.

**7.**

Claimant's claims under the California Corporate Securities Law fail because he cannot prove the elements of these claims and he lacks standing to assert these claims.

**8.**

Claimant's claims under the California Consumer Legal Remedies Act fail because he cannot prove the elements of these claims and he lacks standing to assert these claims.

**9.**

The losses, if any, were sustained as a result of Claimant's own assumption of risk and/or negligence.

**10.**

To the extent Claimant claims he was unaware of the risks involved in the investments at issue or unaware of the decline in value of those investments, Claimant failed to use the requisite due care in evaluating, trading, or monitoring the RMK Funds.

Exhibit B Page 45

**11.**

Based on the provisions of the RMK Funds' prospectuses, Claimant is estopped from claiming reliance on any alleged representations to the contrary.

**12.**

Claimant's losses were due to market conditions, not because of anything Morgan Keegan did.  When an investor's loss is due to "an independent intervening cause, such as a fluctuation in the stock market ... the chain of causation" is broken, and the investor may not recover.

**13.**

Claimant, by his actions and inactions, waived the right to pursue his claims.

**14.**

The Statement of Claim is barred, in whole or in part, based upon Claimant's failure to mitigate damages.

**15.**

Morgan Keegan owed no fiduciary duties to Claimant and, even if it had, no such duties were breached.

**16.**

To the extent that Claimant asserts claims for alleged violations of NASD or NYSE Rules, no such private right of action exists.

**17.**

The Statement of Claim is barred, in whole or in part, by the equitable doctrines of laches, unclean hands and estoppel.

**18.**

Claimant's claims are barred, in significant part, by applicable statutes of limitations.

Exhibit __B__ Page __46__

**19.**

Claimant is not entitled to recover attorneys' fees or punitive damages in this arbitration under applicable law.

**20.**

Claimant's claims appear similar to those pending in various putative class actions filed in the United States District Court for the Western District of Tennessee on behalf of purchasers of the RMK Funds. NASD Rule 12204, as adopted by FINRA, prohibits Claimant from proceeding with claims based upon the same facts, law, and defendants as are involved in a putative class action unless the party bringing the arbitration files either:

(1) a copy of a notice filed with the court in which the class action is pending that the party will not participate in the class action or in any recovery that may result from the class action, or has withdrawn from the class according to any conditions set by the court; or

(2) a notice that the party will not participate in the class action or in any recovery that may result from the class action.

(NASD Rule 12204.) Without such a filing, this action cannot proceed.

**21.**

Although James Kelsoe retained his securities registrations through Morgan Keegan, the Statement of Claim raises no issues with respect to any activities relating to his registrations. Rather, the Statement of Claim rests entirely on disclosures in the Fund's public filings. Although the issue of Morgan Keegan's supervision of Mr. Kelsoe is not relevant to this claim, the Firm responsibly and adequately supervised Mr. Kelsoe as required by law and NASD rules.

Exhibit __B__ Page __47__

## IV. CONCLUSION

Claimant has no basis whatsoever to seek recovery under any theory set forth in the Statement of Claim. Accordingly, the Panel should reject Claimant's Statement of Claim in its entirety, order that all of Morgan Keegan's attorneys fees and costs to be paid by Claimant, and order that forum fees be borne by Claimant.

Respectfully submitted this 9th day of July, 2008.

S. Lawrence Polk
Georgia Bar No. 582959
Keith J. Barnett
California Bar No. 210436

SUTHERLAND ASBILL & BRENNAN LLP
999 Peachtree Street, NE
Atlanta, GA 30309-3996
404/853-8000 (telephone)
404/853-8806 (facsimile)

Attorneys for Morgan Keegan & Company, Inc

23

Exhibit B Page 48

BEFORE
FINRA DISPUTE RESOLUTION, INC.

<u>In the Matter of the Arbitration Between:</u>

HORACE GRANT,             )
                              )
                              )
        Claimant,         )
                              )
vs.                           )        FINRA NO. 08-00775
                              )
MORGAN KEEGAN & COMPANY, INC.,  )
                              )
        Respondent.       )
_____)

## <u>PROOF OF SERVICE</u>

I hereby certify that I have served all parties with the within and foregoing **ANSWER**

**OF RESPONDENT MORGAN KEEGAN & COMPANY, INC.,** via overnight delivery to:

    **Original and three copies to:**

    Audrey Philips
    FINRA Dispute Resolution
    300 South Grand Avenue
    Suite 900
    Los Angeles, CA  90071-3135

    **One service copy to:**

    David Neuman, Esq.
    Stoltmann Law Offices, P.C.
    10 South LaSalle Street
    Suite 3500
    Chicago, IL 60603

Exhibit _B_ Page _49_

Scott Bernstein
Law Offices of Scott Bernstein
10510 Superfortress Ave., Suite C
Mather Field, CA  95655

This 9th day of July 2008.

_____
Keith J. Barnett

25

# EXHIBIT "C"

**FINRA Dispute Resolution**
**Western Processing Center**
**300 S. Grand Avenue**
**Suite 900**
**Los Angeles, CA 90071**
**E-mail:WesternProcessingCenter@finra.org**
**Phone: 213-613-2680**



Number of Pages including the Cover Sheet:     13

Date: 09/11/2009

| | |
|---|---|
| Case Number: | 08-00775 |
| Case Name: | Horace Grant vs. Morgan Keegan & Company, Inc. |
| To: | Terry R. Weiss |
| | Phone: 678-553-2100Fax: 678-553-2212 |
| From: | Audrey Philips |
| | Case Administrator |

Message:

This facsimile transmission is intended only for the addressee(s) shown above. It may contain information that is privileged, confidential, or otherwise protected from disclosure. Any review, dissemination or use of this transmission or its contents by persons other than addressee is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone at the above number.

Exhibit  C   Page 51



Financial Industry Regulatory Authority

September 11, 2009

Terry R. Weiss
Greenberg Traurig LLP
3290 Northside Parkway, Suite 400 The Fo
Atlanta, GA 30327

Subject:   FINRA Dispute Resolution Arbitration Number 08-00775
           Horace Grant vs. Morgan Keegan & Company, Inc.

Dear Mr. Weiss:

In accordance with the Code of Arbitration Procedure I enclose the decision reached by the
arbitrator(s) in the above-referenced matter.

<u>Responsibility to Pay Monetary Award</u>

Pursuant to the Code of Arbitration Procedure[1] the responsible party must pay any monetary
awards within 30 days of receipt unless a motion to vacate has been filed with a court of
competent jurisdiction.  If an award is not paid within 30 days, the responsible party must pay
post-judgment interest at the legal rate or as provided in the award by the arbitrator(s).

<u>Tracking Payment of Award</u>

FINRA Dispute Resolution has implemented a system of monitoring and tracking compliance with
arbitration awards by members and associated persons. We request prevailing claimants to notify
us in writing when their awards have not been paid within 30 days of receipt of the award, and
require member firms to certify in writing that they have complied with awards against them or
their associated persons.

Written notification concerning award compliance or lack thereof must be directed to:

                         Avichai Badash
                  FINRA Dispute Resolution
                       One Liberty Plaza
                 165 Broadway, 52nd Floor
                      New York, NY 10006

_____
[1]Customer Code Rule 12904
Industry Code Rule 13904
Old Code Rule 10330(h)

Exhibit __C__ Page _52_

Investor protection. Market integrity.

Dispute Resolution
West Regional Office

300 South Grand Avenue
Suite 900
Los Angeles, CA
90071-3135

t  213 613 2680
f  213 613 2677
www.finra.org

212-858-4325 (tel) 301-527-4739 (fax)

### Expedited Suspension Proceedings for Non-Payment of Awards

Members and associated persons who do not comply with an award in a timely manner are subject to expedited suspension proceedings as set forth in Rule 9554.

### Right to File Motion to Vacate Award

All awards are final and are not subject to review or appeal by the arbitration panel or by FINRA Dispute Resolution. Any party wishing to challenge the award must make a motion to vacate the award **in a federal or state court** of appropriate jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. § 10, or applicable state statute. There are limited grounds for vacating an arbitration award, and a party must bring a motion to vacate within the time period specified by the applicable statute. Parties and counsel should consult federal and state statutes and case law to determine the appropriate court, standards, and time limitations in their individual circumstances. FINRA Dispute Resolution is not authorized to provide legal advice concerning a motion to vacate.

A motion to vacate, confirm, or modify an arbitration award is a matter only between the parties to the arbitration. FINRA Dispute Resolution is not a proper party to post-award motions and should not be named as a party to any post-award motion. However, for cases filed on or after April 12, 2004, if the award contains expungement relief, or if a party seeks expungement relief in court, there may be a duty to name FINRA as a party as provided in Rule 2080.

### Questions Concerning Award

Please direct any questions regarding this award to me. **The parties must not contact the arbitrators directly.**

### Forum Fees

You will receive under separate cover an invoice that reflects the fees assessed and any outstanding balance or refund due. **Fees are due and payable to FINRA Dispute Resolution upon receipt of the invoice and remitted to the address specified on the invoice.**

Any applicable refunds will also be sent under separate cover approximately 45 days after the case closes. Pursuant to the Code of Arbitration Procedure, "Any refunds of fees or costs incurred under the Code will be paid directly to the named parties, even if a non-party made payment on behalf of the named parties."[2]

All questions regarding payment of fees and refunds should be directed to FINRA Finance at (240) 386-5910.

### Arbitration Evaluation

As a service organization, the primary goals of FINRA Dispute Resolution are the integrity of its process and the satisfaction of its clients. To ensure that we are meeting your needs and satisfying our commitment to you, **we need to hear from you.** If you have not already done so,

---

[2] Customer Code Rule 12902(e)
   Industry Code Rule 13902(e)

Exhibit  C   Page  53

please take the time to complete an evaluation of our services, the process, and the arbitrator(s) assigned to your case. For your convenience, we have now made it possible for you to evaluate our services using the Internet. Please direct your Web browser to http://www.finra.org/arbevaluation.

If you do not have Internet access, or have difficulty completing the evaluation form online, we will send a hard copy evaluation form to you. The completed evaluation form should be mailed in to the address indicated below. If you need a hard copy of the evaluation form, please contact the undersigned. Whenever possible, however, we encourage you to use the new online version, as it will help us to review your feedback in a more expeditious manner. Your feedback is a valuable and necessary component in our efforts to serve you better.

Very truly yours,

Audrey C. Philips
Case Administrator
Phone:    213-613-2680
Fax:        301-527-4766
WesternProcessingCenter@finra.org

ACP:mxs:LC09A
idr: 08/25/2009

RECIPIENTS:
    Andrew Stoltmann, Esq., Horace Grant
    Stoltmann Law Offices, PC, 10 South LaSalle Street, Suite 3500, Chicago, IL 60603

    Terry R. Weiss, Morgan Keegan & Company Inc
    Greenberg Traurig LLP, 3290 Northside Parkway, Suite 400 The Fo, Atlanta, GA 30327

Exhibit __C__ Page 54



**FINRA**
Financial Industry Regulatory Authority

September 11, 2009

Terry R. Weiss
Greenberg Traurig LLP
3290 Northside Parkway, Suite 400 The Fo
Atlanta, GA 30327

Subject:   FINRA Dispute Resolution Arbitration Number 08-00775
           Horace Grant vs. Morgan Keegan & Company, Inc.

Dear Mr. Weiss:

An arbitration Panel issued the enclosed award ordering you, or your client(s), to pay monetary damages or provide other relief to a party in the above-referenced matter.

Please be aware that the Code of Arbitration Procedure[1] provides as follows:

> All monetary awards shall be paid within thirty (30) days of receipt unless a motion to vacate has been filed with a court of competent jurisdiction. An award shall bear interest from the date of the award: (1) if not paid within thirty (30) days of receipt, (2) if the award is the subject of a motion to vacate which is denied, or (3) as specified by the arbitrator(s) in the award.  Interest shall be assessed at the legal rate, if any, then prevailing in the state where the award was rendered, or at a rate set by the arbitrator(s).

FINRA Dispute Resolution has implemented a system of monitoring and tracking compliance with arbitration awards by members and associated persons.  Therefore, we request prevailing claimants to notify us in writing when their awards have not been paid within 30 days of receipt of the award, and require member firms to certify in writing that they have complied with awards against them or their associated persons.

**Members must notify FINRA Dispute Resolution in writing, within 30 days of receipt of the award, whether or not they or their associated persons have complied with the award.  The 30-day period ends on:**  October 12, 2009 Associated persons who have changed employment since the arbitration claim was filed are required to notify FINRA Dispute Resolution directly regarding the payment status of any awards against them.  Please review Notice to Members 00-55 for more information on the notification requirement and the sanctions for noncompliance.

---

[1]Customer Code Rule 12904(i)
 Industry Code Rule 13904(i)
 Old Code Rule 10330(h)

Exhibit  C  Page  55

Investor protection. Market integrity.

Dispute Resolution          300 South Grand Avenue     t 213 613 2680
West Regional Office        Suite 900                  f 213 613 2677
                            Los Angeles, CA            www.finra.org
                            90071-3135

All awards are final and are not subject to review or appeal by the arbitration panel or by FINRA Dispute Resolution. Any party wishing to challenge the award must make a motion to vacate the award in a federal or state court of appropriate jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. § 10, or applicable state statute. There are limited grounds for vacating an arbitration award, and a party must bring a motion to vacate within the time period specified by the applicable statute. Parties and counsel should consult federal and state statutes and case law to determine the appropriate court, standards, and time limitations in their individual circumstances. A motion to vacate, confirm, or modify an arbitration award is a matter only between the parties to the arbitration. FINRA Dispute Resolution is not a proper party to post-award motions and should not be named as a party to any post-award motion.

Please direct any questions regarding this award to me. **The parties must not contact the arbitrators directly.**

Please forward any questions or correspondence concerning the monitoring and tracking of arbitration awards and/or payment of awards to:

Avichai Badash
FINRA Dispute Resolution
One Liberty Plaza
165 Broadway, 52nd floor
New York, NY, 10006

You may also contact him by telephone at 212-858-4325, fax at 301-527-4739, or e-mail at avichai.badash@finra.org.

Very truly yours,

Audrey C. Philips
Case Administrator
Phone:   213-613-2680
Fax:       301-527-4766
WesternProcessingCenter@finra.org

ACP:mxs: LC09X
ldr: 08/26/2009

RECIPIENTS:
      Terry  R. Weiss, Morgan Keegan & Company Inc
      Greenberg Traurig LLP, 3290 Northside Parkway, Suite 400 The Fo, Atlanta, GA 30327

Exhibit __C__ Page __56__

**Award**
**FINRA Dispute Resolution**

In the Matter of the Arbitration Between:

Claimant                              Case Number: 08-00775
Horace Grant

Respondent                            Hearing Site: Los Angeles, California
Morgan Keegan & Company Inc.

Nature of the Dispute: Customer vs. Member

## REPRESENTATION OF PARTIES

Claimant, Horace Grant, hereinafter referred to as "Claimant": Andrew Stoltmann, Esq.,
Stoltmann Law Offices, P.C., Chicago, Illinois.

Respondent, Morgan Keegan & Company Inc., hereinafter referred to as "Respondent":
Terry R. Weiss, Esq., Greenberg Traurig LLP, Atlanta, Georgia.

## CASE INFORMATION

Statement of Claim filed on:  March 17, 2008

Claimant signed the Submission Agreement:  March 12, 2008

Statement of Answer filed by Respondent on:  July 10, 2008

Respondent signed the Submission Agreement:  May 23, 2008

## CASE SUMMARY

Claimant asserted the following causes of action:  1) misrepresentations and omissions;
2) violations of California Corporate Securities Code sections 25000, 25400(d), 25401
and 25216; 3) violation of the California Consumer Legal Remedies Act; 4) breach of
fiduciary duty; 5) violation of NASD Conduct Rule 2110, Rule 2120, NASD Conduct
Rule IM-2310-2 and NASD Conduct Rule 3010(a); 6) negligence; 7) failure to supervise;
8) breach of contract; 9) fraudulent misrepresentation; and 10) vicarious liability.  The
causes of action relate to investments in Regions Morgan Keegan Multi-Sector Income
Fund, Regions Morgan Keegan High Income Fund, Regions Morgan Keegan Strategic
Income Fund and Regions Morgan Keegan Advantage Income Fund.

Exhibit ___C___  Page 5]

FINRA Dispute Resolution
Arbitration No. 08-00775
Award Page 2 of 5

Unless specifically admitted in its Answer, Respondent denied the allegations made in the
Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested:
    1) Compensatory Damages in excess of $1,503,423.68;
    2) Punitive Damages;
    3) Interest;
    4) Attorneys' Fees; and
    5) Other Costs.

Respondent requested dismissal of the Statement of Claim in its entirety and costs.

## OTHER ISSUES CONSIDERED AND DECIDED

The Panel acknowledges that they have each read the pleadings and other materials filed
by the parties.

The parties have agreed that the Award in this matter may be executed in counterpart
copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing,
the Panel has decided in full and final resolution of the issues submitted for
determination as follows:

1. Respondent is liable and shall pay to Claimant compensatory damages in the sum of
   $1,450,000.00.

2. Respondent is liable and shall pay to Claimant costs in the sum of $10,000.00.

3. Any and all relief not specifically addressed herein, including punitive damages, is
   denied.

Exhibit _C_  Page 58

FINRA Dispute Resolution
Arbitration No. 08-00775
Award Page 3 of 5

## FEES

Pursuant to the Code, the following fees are assessed:

### Filing Fees
FINRA Dispute Resolution assessed a filing fee* for each claim:
    Initial claim filing fee            = $1,800.00

*The filing fee is made up of a non-refundable and a refundable portion.

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the event giving rise to the dispute. Accordingly, as a party, Morgan Keegan & Company Inc. is assessed the following:

    Member surcharge            = $2,800.00
    Pre-hearing process fee      = $ 750.00
    Hearing process fee         = $5,000.00

### Adjournment Fees
Adjournments granted during these proceedings for which fees were assessed:

August 24, 2009, adjournment by parties          = Waived

### Discovery-Related Motion Fees
Fees apply for each decision rendered on a discovery-related motion.

Three (3) Decisions on discovery-related motions on the papers
with (1) one arbitrator @ $200.00           = $600.00
Respondent submitted (3) discovery-related motions

Total Discovery-Related Motion Fees        = $600.00

The Panel has assessed $600.00 of the discovery-related motion fees to Respondent.

### Contested Motion for Issuance of a Subpoena Fees
Fees apply for each decision on a contested motion for the issuance of a subpoena.

One (1) Decision on a contested motion for the issuance of a subpoena
(1) one arbitrator @ $200.00            = $200.00

Total Contested Motion for Issuance of Subpoenas Fees    = $200.00

The Panel has assessed $200.00 of the contested motion for issuance of subpoenas fees to Respondent.

Exhibit C Page 59

FINRA Dispute Resolution
Arbitration No. 08-00775
Award Page 4 of 5

## Hearing Session Fees and Assessments

The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrators, including a pre-hearing conference with the arbitrators, that lasts four (4) hours or less. Fees associated with these proceedings are:

One (1) Pre-hearing session with Panel @ $1,200.00/session            = $1,200.00
Pre-hearing conference:     August 4, 2008        1 session

Eight (8) Hearing sessions @ $1,200.00/session                        = $9,600.00
Hearing Dates:              August 25, 2009       2 sessions
                            August 26, 2009       2 sessions
                            August 27, 2009       2 sessions
                            August 28, 2009       2 sessions

Total Hearing Session Fees                                         = $10,800.00

The Panel has assessed $10,800.00 of the hearing session fees to Respondent.

All balances are payable to FINRA Dispute Resolution and are due upon receipt.

Exhibit ___C___ Page _6O_

FINRA Dispute Resolution
Arbitration No. 06-00775
Award Page 5 of 5

## ARBITRATION PANEL

William J. Adams       -        Public Arbitrator, Presiding Chairperson
William Lee Krantz     -        Public Arbitrator
Jonathan Schwartz  -        Non-Public Arbitrator

## Concurring Arbitrators' Signatures

_____
William J. Adams
Public Arbitrator, Presiding Chairperson

_____
Signature Date

_____
William Lee Krantz
Public Arbitrator

9 - 11 - 09
_____
Signature Date

_____
Jonathan Schwartz
Non-Public Arbitrator

_____
Signature Date

9/11/09
_____
Date of Service  (For FINRA Dispute Resolution use only)

Exhibit C  Page 61

FINRA Dispute Resolution
Arbitration No. 08-00775
Award Page 5 of 5

## ARBITRATION PANEL

William J. Adams            –        Public Arbitrator, Presiding Chairperson
William Lee Krantz          –        Public Arbitrator
Jonathan Schwartz  –          Non-Public Arbitrator

## Concurring Arbitrators' Signatures

_____
William J. Adams                                    Signature Date
Public Arbitrator, Presiding Chairperson

_____
William Lee Krantz                                  Signature Date
Public Arbitrator

_____                           9·11·09
Jonathan Schwartz                                   Signature Date
Non-Public Arbitrator

_____   9/11/09
Date of Service  (For FINRA Dispute Resolution use only)

Exhibit  C  Page 62

P - 1

FINRA Dispute Resolution
Arbitration No. 08-00775
Award Page 5 of 5

## ARBITRATION PANEL

William J. Adams         -        Public Arbitrator, Presiding Chairperson
William Lee Krantz       -        Public Arbitrator
Jonathan Schwartz  -       Non-Public Arbitrator


## Concurring Arbitrators' Signatures


_____                    _09/11/09_
William J. Adams                                       Signature Date
Public Arbitrator, Presiding Chairperson


_____                       _____
William Lee Krantz                                    Signature Date
Public Arbitrator


_____                       _____
Jonathan Schwartz                                     Signature Date
Non-Public Arbitrator


_____9/11/09_____
Date of Service  (For FINRA Dispute Resolution use only)


Exhibit __C__ Page 63

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF SANTA MONICA:

I am employed in the aforesaid county, State of California; I am over the age of 18 years and not a party to the within action; my business address is **2450 Colorado Avenue, Suite 400E, Santa Monica, CA 90404.**

On the below date, I served copies of **DECLARATION OF TERRY R. WEISS IN SUPPORT OF MORGAN KEEGAN & CO., INC.'S PETITION TO VACATE ARBITRATION AWARD** on the interested parties in this action by placing the true copy thereof, enclosed in a sealed envelope, postage prepaid, addressed as follows:

Original and three copies to:

Audrey C. Phillips
Case Administrator
FINRA Dispute Resolution
300 South Grand Avenue, Suite 900
Los Angeles, CA 90071-3135

One Service Copy to:

Andrew Stoltmann, Esq.
Stoltmann Law Offices, P.C.
10 South LaSalle Street, Suite 3500
Chicago, IL 60603

☐ **(BY MAIL)**

☐ I am readily familiar with the business practice of my place of employment in respect to the collection and processing of correspondence, pleadings and notices for mailing with United States Postal Service. The foregoing sealed envelope was placed for collection and mailing this date consistent with the ordinary business practice of my place of employment, so that it will be picked up this date with postage thereon fully prepaid at Santa Monica, California, in the ordinary course of such business.

☒ **(BY FEDERAL EXPRESS)**

I am readily familiar with the business practice of my place of employment in respect to the collection and processing of correspondence, pleadings and notices for delivery by Federal Express. Under the practice it would be deposited with Federal Express on that same day with postage thereon fully prepared at Santa Monica, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if delivery by Federal Express is more than one day after date of deposit with Federal Express. Executed on the below date, at Santa Monica, California.

☒ **(FEDERAL)**   I declare under penalty of perjury that the foregoing is true and correct, and that I am employed at the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 9, 2009, at Santa Monica, California.

_____
Delilah A. Phiefer

---

PROOF OF SERVICE

ATL 17,298,332v1 10-9-09